13472

HOWLE v. MOUNTAIN ICE CO. *ET AL.*

(165 S. E., 724)

*Messrs. Samuel Want, C. J. Gasque, P. H. McEachin* and *Melvin Hyman,* for appellant,

*Messrs. Willcox & Hardee* and *D. Gordon Baker,* for respondent, Florence Ice & Fuel Co.,

*Messrs. Benet, Shand & McGowan,* for respondent, Mountain Ice Company,

August 15, 1932.

The opinion of the Court was delivered by MR. JUSTICE STABLER.

In this action the plaintiff, B. H. Howle, seeks to recover from the defendants, Florence Ice & Fuel Company (hereinafter referred to as the Florence Company) and Mountain Ice Company (hereinafter referred to as the Mountain Company), damages for injuries alleged to have been sustained by him by reason of certain acts of the defendants in pursuance of a combination and conspiracy, directed particularly at him, for the elimination of competition in the sale of ice at retail in the City of Florence. The case came on for trial at the May, 1931, term of the Court of Common Pleas of Florence County, before Hon. S. W. G. Shipp and a jury. At the conclusion of the testimony a motion for a nonsuit was granted on the ground that plaintiff had failed to make out a case under his complaint. Plaintiff appeals upon exceptions assigning error to the presiding judge in granting the motion and in excluding certain evidence.

A brief chronology at this point will aid in an understanding of the case:

1927: Plaintiff began selling ice at retail in Florence and continued until the fall of the year, making his purchases principally from the Mountain Company.

1928: Under contract dated March 26, 1928, plaintiff purchased ice from E. B. McLaurin (Timmonsville Ice & Fuel Company) until June 14, 1928, when he entered into a contract with the Florence Company. He continued purchases under the latter contract until November, 1928, when he purchased a plant in Dillon, from which he subsequently obtained ice for his sales. During this year, the Florence Company did not operate its plant, but secured its ice from the Mountain Company.

1929: Early in this year, in conjunction with A. R. Harrell, plaintiff formed the City Ice & Fuel Company, a corporation, which built a plant in Florence for the manufacture of ice; since that time this company has been engaged in the ice business, but not plaintiff individually.

The Mountain Company owned a large ice plant at Florence and was engaged principally in supplying ice for the refrigeration of express cars, disposing of its surplus locally. The Florence Company also owned a plant at Florence and sold ice at wholesale and retail.

Prior to the year 1927 plaintiff conducted a poultry and meat market in Florence, and in that year added a retail ice business, operating two trucks. He purchased his ice from the Mountain Company at $6 per ton, but in October or November his requirements became smaller and the company refused to sell him in less than ton lots. He then made arrangements to buy ice in less than ton lots from one Johnson, a more extensive dealer. At first Johnson gave him orders on the Mountain Company, and upon presentation of these orders ice was delivered to him at the company's platform at $6 per ton. After about ten days or two weeks,

the company refused to accept the orders, and then for a short time Johnson delivered ice to plaintiff at plaintiff's place of business at $7 per ton. Johnson presently sold out to the Florence Company, and plaintiff, having then discontinued his ice business, purchased ice for his market from that company, receiving it from the company's trucks and paying for it at the rate of 65 cents per hundred, the regular retail price charged to other people.

In preparation for 1928 business, plaintiff, apparently without attempting to deal with either of the defendants, went to Timmonsville to make arrangements to get ice from E. B. McLaurin (Timmonsville Ice & Fuel Company), who operated a plant at that point and one at Rockingham, N. C. On March 26, 1928, a contract was made by which McLaurin was to furnish Howle, during the remainder of the year, a minimum of 300 tons of ice at $6 per ton f.o.b. platform at Timmonsville, cash with each load.

As the season advanced, McLaurin was unable to meet Howle's requirements from ice of his own manufacture and, in order to enable him to comply with his contract, arranged to furnish Howle ice purchased by McLaurin from the Carolina Ice & Packing Company, which operated a plant in Darlington and of which M. L. Coggeshall was president and general manager; Coggeshall delivered ice to Howle at Darlington upon McLaurin's orders—he testified, however, that he did not know, at the time he agreed to sell ice to McLaurin, that this ice would eventually go to Howle, and that he never intended to sell ice in Florence. In the meantime Coggeshall offered to sell ice directly to Howle at the price at which he was selling local towns around Darlington County, but not the price at which he was selling McLaurin. While matters were in this state, W. A. Lewis, manager of the Florence Company, and J. H. Sharpe, manager of the Mountain Company, had a conversation with Coggeshall, in the course of which they asked why he was selling ice in Florence and told him that this would

probably upset things and might cause them to have to sell in Darlington. He answered that he had already contracted with McLaurin, and if McLaurin wanted the ice he would let him have it; subsequently, however, he held a conference with McLaurin, who released him from the contract, and deliveries to Howle were discontinued. Coggeshall testified that his attitude in this respect was not due to any fear on his part of the Florence Company, but to the fact that he considered it bad policy to sell ice in Florence, where others had ice plants.

McLaurin's next step was to arrange with the Sumter Ice & Fuel Company to procure ice for Howle, but for reasons not shown by the testimony the Sumter concern soon discontinued deliveries. Thereupon, McLaurin turned to the Buttercup ice people, who had a plant at Sumter, of which L. A. Corning, Jr., was manager, to get ice for Howle; for a short time ice was shipped by rail by this concern to McLaurin at Timmonsville, Howle taking delivery from the cars at that point. Corning had a conversation with a man, who, he said, looked like Sharpe and who gave the impression that he would rather Corning would not ship ice into Florence, but he continued to ship ice to Timmonsville as long as McLaurin applied for it, and said that if orders had continued to come he would have continued to ship.

During the period in which Howle was getting ice from McLaurin, Sharpe and Lewis had a conversation with the latter with reference to the matter, telling him that they were surprised that he had sold any ice to go to Florence and that during the previous year Howle had gone out of the ice business before the season was over and was weak financially—he was bad pay and McLaurin was taking a risk about getting his money, or words of that general purport. Speaking apparently of their own strength, they told him he "couldn't buck a concern like that, that they had a large surplus of ice and plenty of money."

On June 21, 1928, McLaurin and the Florence Company, each having theretofore been instrumental in selling ice at retail in the other's home territory, entered into a contract for the sale to the former by the latter of not less than 300 nor more than 3,000 tons of ice, during each of the years 1928, 1929, and 1930, at $3.50 per ton f.o.b. Florence, the contract also providing that McLaurin should rent from the Florence Company an icehouse at Timmonsville at a stated rental and that a part of the consideration to each party thereto for the purchase of the quantity of ice therein provided for and at the low price therein stipulated was an agreement of the Florence Company to sell ice to no other dealer in Timmonsville during the period of the contract and an agreement of McLaurin to sell no ice during such period in Florence or any other town in the State where there should be located a dealer at the time purchasing his ice requirements from the Florence Company. McLaurin took ice under this contract only during the first year and only 250-300 tons. Later he purchased ice from the same company at $4.50 per ton.

On June 14, 1928, having been apprised by Lewis of an agreement practically reached by McLaurin and the Florence Company to the effect that they would stay out of each other's territory—this agreement apparently being that included in the subsequent contract of June 21, 1928, above referred to—and McLaurin having confirmed this advice, plaintiff entered into a written agreement with the Florence Company for the sale to him by the company of all the ice he might require for sale in Florence and its suburbs for a period of three years at $7.50 per ton f.o.b. plant of that company or plant of the Mountain Company, cash upon receipt of ice; the contract also providing that none of the ice to be delivered to Howle should be used for sale in any other territory than that embraced within the City of Florence and its suburbs. Plaintiff testified that he did not sign this contract voluntarily, but that he had tried without success to

get ice at Marion, Mayesville, Columbia, Hamlet, Darlington and Sumter, before the contract was offered him by Lewis. Under this contract deliveries were made to plaintiff, in ton lots or less, partly (and principally) at the Mountain Company and partly at the Florence Company; and all payments were made to the latter. While the contract was in force, the Florence Company, plaintiff said, tried to get him to raise the price of ice to 65 cents, their retail price, though it does not appear that they succeeded; J. W. Taylor, one of plaintiff's witnesses, testifying that when Howle made the retail price of ice 50 cents, the others, who had been selling at 65 cents, came down to 50 cents also. On November 16, 1928, Howle owed the company some thirty-odd dollars for ice, and deliveries were stopped. The debt was paid— perhaps the next day—and the company notified him that it had not refused delivery, but no further deliveries were made. Apparently, neither party insisted that the contract be carried out.

It was about this time (November, 1928) that Howle purchased the plant at Dillon and began to manufacture ice for his sales, and shortly thereafter (early in 1929) that he organized, with Harrell, the City Ice & Fuel Company, no longer engaging individually in the ice business.

In the winter of 1928-29 Coggeshall bought ice at $3.50 per ton, under a verbal agreement with the Florence Company and the Mountain Company, the ice being billed through the former and delivered at the plant of the latter, the reason for the purchase being that he thought he "might be able to buy it as cheap" as he could make it.

During the year 1929 Lewis and Sharpe went to the office of the City Ice & Fuel Company and had some conversation with Harrell relative to the price of ice. It appears that Howle had sold the Florence Fish & Oyster Company some white ice cheaper than Lewis had been selling them, and Lewis told Harrell that he had obtained permission from

Chicago to reduce the price to those particular people and that he had made arrangements to furnish them ice. So far as Harrell knew, his company never sold these people any more ice. In discussing the price of ice, Lewis said that if Harrell undertook to cut prices he might take his equipment off the streets, quit the retail business, and sell ice on the platform to peddlers, or anybody else who wanted it, at $3.50 per ton; the price of ice in the quantities referred to being, as the witness Harrell thought, about $6.00 or $6.50. No tangible result appears to have followed this discussion. Harrell also testified that Sharpe and Lewis also talked with him about Howle but could not recall exactly what they said; they made the impression on him that Howle "was not very open—he was not exactly straight, and he was pretty slow, and I would have to be careful with him." After the organization of the City Ice & Fuel Company, it bought all the ice it applied for from the Florence Company in 1929 and 1930 at $6.50 per ton, there being no showing that such price was different from that to others in the same class.

In 1929 the Carolina Ice & Fuel Company of Darlington, which had eight plants in as many different towns, bought ice from the Florence Company, delivery at the Mountain Company's plant, at $3.50 in ton lots or more; Sharpe not coming into the picture at all. The manager of the Carolina Company testified that, as he thought, Lewis stated that Howle, or the City Ice & Fuel Company, was paying him $6.00 for ice at that time. In June, 1930, the Carolina Company sold two or three loads of ice to Howle's company at $5.00 f.o.b. Darlington. Lewis telephoned the plant manager at that point that if he let Howle have any more ice he would put ice on the streets of Darlington within an hour, or words to that effect, but did not say anything about selling ice at a cheaper price. The Carolina Company sold Howle's company no more ice; and an agreement was made between that company and the Florence Company that the former would close its plant in winter and buy its winter

ice from the latter, and each would stay out of the other's territory.

J. W. Taylor, a colored merchant of Florence, testified that he used about six or seven hundred pounds of ice a week and bought from both Howle and the Florence Company; that along in 1928 he had a conversation with one Debs, a white man, and one Williams, a Negro, who sold ice to him from the Florence Company's truck, and that they told him they had brought the price of ice down even with the other man and that he "better continue on buying with them, because that they was going to buy out all the other companies—they had done bought out the Mountain Ice Company, and I knowed that myself—I stuck on with them—I bought ice with them this morning, because I don't know when they is going to buy Mr. Howle out. I buy with 'em both." He testified further that they said: "If I didn't mind they would all be dead anyhow and I may as well keep on with the old plant. They told me if I cut off from them and got to buying all from them, after while I would have to get right back to them, because they would buy out everything, so I stuck on with 'em both. I am buying from both right on."

The evidence shows also that one Gill and one Faulkner, who had been employed by the plaintiff on a commission basis, left him "on a statement of a better price they could get ice for" from the Florence Company.

As to the nonsuit: Appellant offered no direct proof of the formation of a conspiracy between the defendants as alleged in the complaint, relying upon circumstantial evidence as a basis from which the existence of such conspiracy might be inferred. We think it must be conceded at the outset that nothing that occurred in the year 1927 could have any bearing on the issues involved in the case, and that appellant must recover, if at all, upon later developments. He contends that by acts of the defendants he was deprived of the privilege of purchasing ice from McLaurin at Tim-

monsville, in accordance with his contract of March 26, 1928, and was prevented from purchasing ice elsewhere than from defendants, who were willing to sell him only at exorbitant prices; and that, due to such interference by defendants, he was injured in his business as an ice dealer. In addition to testimony to support this contention—specifically, the claim for damages—he introduced evidence as to collateral matters and matters occurring after he discontinued his individual ice business in order to show the existence of the conspiracy and the continuation of defendant's purposes and intentions. All the testimony may be divided generally into four classes and will be so considered.

1. Threats or suggestions made by defendants to the owners of ice factories from which plaintiff was obtaining ice for sale in Florence to the effect that unless such owners would discontinue supplying plaintiff with ice, or selling ice in Florence, defendants would open retail ice stations in the towns in which such factories were located, and subsequent agreements between defendants and such owners not to retail ice in each other's territory: In this connection it must be borne in mind that the manufacture and sale of ice is not a public service enterprise and, therefore, transactions in connection therewith stand on the same basis as those in any other business of a purely private nature and are not governed by the rules applicable to public utilities. Any one of the manufacturers concerned in the agreements referred to could have lawfully refrained from selling ice in any particular town or city, and the agreements not to sell in certain towns or cities merely evidenced the intention to do that which the parties had a right to do and appear to have been reasonably limited as to time and place and in general to have been such as are recognized as valid and legal. The threats or conversations leading up to the agreements had no results other than the agreements themselves and the consequent course of the parties in fulfillment thereof.

2. Statements by representatives of the defendants concerning Howle personally—his ability to pay, his integrity, etc.: It must be borne in mind that this is not an action for slander, but one for conspiracy, resulting in injury to the plaintiff, and hence these statements must be considered only in connection with the question of conspiracy and its effects upon the plaintiff. The conversation between representatives of the defendants and McLaurin took place in the period during which the contract between the latter and Howle was in force. It must be noted, however, that under this contract Howle was required to pay cash for each load of ice as he received it, and hence it is difficult to see how the conversation could have resulted in any injury to him. Furthermore, the testimony is hardly susceptible of the inference that this conversation had any effect on McLaurin in his dealings with Howle. The testimony of the witness, Taylor, as to his conversation with Debs and Williams shows that Taylor was dealing with the Florence Company before Howle started to sell ice, and that after that time Howle got a part of his business. Apparently Howle's cutting the price appealed—and naturally —to Taylor, but when the Florence Company met the reduced price he continued to buy from both companies, even up to the time of the trial. The remarks made to Harrell, Howle's associate in his new corporation, were made after Howle had discontinued his individual ice business and are not shown to have resulted in any injury to him.

3. Discriminatory prices : On his own initiative and apparently without attempting to deal with either of the defendants, Howle sought out McLaurin at Timmonsville and contracted with him to buy ice at $6.00 per ton f.o.b. platform at Timmonsville, cash with each load. On June 14 of the same year, and after McLaurin had discontinued delivering ice to him, he made a contract with the Florence Company for ice at $7.50 per ton f.o.b. platform at Florence. Seven days later McLaurin made a con-

tract for the purchase of ice from the Florence Company at $3.50 per ton. As between Howle's contract with the Florence Company and McLaurin's contract with the same company, it must be borne in mind that McLaurin was a manufacturer while Howle was a retailer, and it is a matter of common knowledge that prices to different classes of customers vary according to varying conditions. In Howle's contract with the Florence Company there was no requirement that he must take ice in ton lots, and the testimony shows that he took at least part of it in less than ton lots. Furthermore, the contract between McLaurin and the Florence Company recognizes by its own terms that the price therein named was a low one and recited as an explanation thereof, *inter alia,* that McLaurin had agreed not to sell ice in Florence or in any town in South Carolina in which there was a dealer who was purchasing his ice at the time from the Florence Company. There is no testimony as to the price at which the Florence Company was selling to other retailers at the date of its contract with Howle, but a comparison might well be made between that contract and Howle's contract with McLaurin. The ice he purchased from McLaurin at $6.00 per ton was delivered to him at Timmonsville and had to be hauled from that point to Florence—indeed, some of it was shipped from Sumter to Timmonsville by rail before being hauled by truck from Timmonsville to Florence—and this method of handling necessarily involved the cost of transportation from Timmonsville to Florence and the loss by evaporation. We do not think that the testimony would justify a jury in finding that the price charged Howle by the Florence Company was discriminatory or excessive. What we have just said applies generally to the other testimony relative to prices the Florence Company charged Howle or his company and those it charged to ice manufacturers, and further detailed reference to such testimony is unnecessary.

4. Inducing plaintiff's employees to leave his service: The

testimony fails to show any illegal or wrongful act of the defendants or either of them in connection with the shift of the two commission men, Gill and Faulkner, from him to the Florence Company.

Realizing that between legitimate competition and unlawful oppression there is a shadowy zone which the light of truth sometimes can scarcely penetrate, we have made a very careful and patient study of the entire record in this case in order to ascertain whether any part of the testimony, or all of it taken together, would justify a finding by the jury that the defendants formed a conspiracy with intent to injure the plaintiff or went any further than to enter into and seek to effectuate, in a legitimate way, the legitimate purpose of reasonably forwarding their own interests, and conclude that the testimony shows only keen competition between and among the ice dealers in Florence and the neighboring towns and cities. Consequently, we think the Circuit Judge correctly granted the nonsuit on the record before him.

As to the exclusion of evidence: Error is imputed to the Circuit Judge in refusing to permit plaintiff to testify as to the reasons given him by several ice manufacturers for refusing to sell him ice. It was made clear that plaintiff intended to show by these declarations that the refusal on the part of the declarants to sell him ice was due to threats made and duress practiced by the defendants. The trial Judge ruled that such declarations were inadmissible unless evidence should first be introduced tending to show the conspiracy—evidence of some communication by the defendants to the manufacturers by which the latter were induced to refuse to sell ice to plaintiff. The declarations were offered, as pointed out by appellant's counsel, not as evidence of the truth of the matters asserted therein, but to prove the state of mind and motive of the declarants; that is, that their refusal to sell ice to the plaintiff was founded upon fear of retaliation by the defendants.

In several instances the manufacturers whose declarations were sought to be introduced testified later in the case, and consequently, as conceded by appellant's counsel, the exceptions raising this question were, as to such witnesses, nugatory. But, aside from this and generally, as there was no testimony that would establish the existence of a conspiracy, the state of mind or motive of the declarants was of no importance, and the exclusion of the testimony was not error. This conclusion disposes of several other exceptions in which a like question was raised.

The trial Judge is also charged with error in refusing to permit plaintiff to testify that as a result of a conference held in Hamlet, N. C., attended by plaintiff and several ice manufacturers, such manufacturers declined to make any further sales or deliveries of ice to him. The exception raising this point was evidently taken under a misconception, as the record clearly shows that the trial Judge, despite the fact that neither of the defendants was represented at the conference, stated that, though he would not admit testimony as to what was there said, he would allow plaintiff to testify whether he got any ice and whether that was the result of the discussions. After this ruling, plaintiff's counsel did not pursue the inquiry.

Error is also predicated upon the Court's refusal to permit the witness, J. H. Christopher, to testify as to the statements made by employees of the defendant, Florence Company, during a transaction by him with such employees relative to the sale of ice. We agree with the Circuit Judge that, as the statements in question were made after the transaction with reference to the sale of ice had been closed, they were not binding on the company.

Appellant also complains of the Court's refusal to permit him to introduce in evidence two letters of the defendant, Mountain Company, addressed to Timmonsville Ice Company and dated March 1, 1927, and April 12, 1927, respectively. An examination of these letters shows that their ex-

clusion was not error, as they were not relevant to the issues raised and had no probative force.

There is an assignment of error for the Court's refusal to admit evidence that the defendant, Florence Company, required plaintiff to accept short weights in ice delivered to him. This testimony was properly excluded by the trial Judge on the ground that there was no allegation in the complaint regarding short weights.

Finally, error is assigned to the Circuit Judge in refusing to permit the witness, C. H. Harris, manager of the Carolina Ice & Fuel Company, to testify as to proposals made to him by the Florence Company with reference to the handling of ice during the summer season of 1931. The only purpose of this testimony, as stated by appellant's counsel, was to show the continued malice of the defendants and their fixed determination to dominate and control the whole ice industry in that section. As the existence of a conspiracy at the time the plaintiff is alleged to have suffered his injury was not shown *aliunde,* the exclusion of the testimony was not error.

The order appealed from is affirmed.

MR. CHIEF JUSTICE BLEASE, MESSRS. JUSTICES CARTER and BONHAM, and MR. W. C. COTHRAN, ACTING ASSOCIATE JUSTICE, concur.

October 11, 1932.

## ON PETITION FOR REHEARING

*Per curiam.*

We have given to appellant's lengthy and earnest petition for rehearing that careful consideration which we feel it deserves; but, as it does not appear that we have overlooked or disregarded any material question of law or of fact, a rehearing must be denied. However, we think it well to refer briefly to one matter discussed in the petition. Petitioner's counsel appear to have understood from the opinion that this Court takes the view, as to

conspiracy, that an act done by two or more persons in pursuance of an agreement is not actionable though resulting in damage, if a like act, done by one person alone, would not be actionable, or, in other words, that two or more may lawfully do, under agreement and regardless of purpose or motive, whatever one may lawfully do singly. Although this rule prevails in some jurisdictions, such is not the majority view or that of this Court. In the opinion we gave no express definition of the term "conspiracy"; and our comment on the facts was by way of elucidation of the nature and effect of the acts done by the defendants and was not intended to suggest, by implication or otherwise, the meaning of "conspiracy" or its necessary elements. In order that there may be no uncertainty in the mind of any one as to the legal principle involved, we add to the paragraph beginning, "realizing that between legitimate competition and unlawful oppression," the following: "In this connection we should not be understood as holding that under no circumstances can an act resulting in damage, when done by two or more pursuant to an agreement, be actionable if a like act, when done by one alone, would not be actionable. The decision here is based solely, as indicated, upon the insufficiency of the evidence to show an agreement between the defendants for the purpose of injuring the plaintiff—the gravamen of the charge."

The petition is dismissed, and the order staying the remittitur revoked.

Mr. Chief Justice Blease, and Messrs. Justices Stabler, Carter and Bonham, and Mr. W. C. Cothran, Acting Associate Justice, concur.